IRVING, Appellant,

v.

AUSTIN et al., Appellees.

[Cite as *Irving v. Austin* (2000), 138 Ohio App.3d 552.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–99–1358.

Decided Aug. 4, 2000.

*Thomas A. Sobecki,* for appellant.

*Julia R. Bates,* Lucas County Prosecuting Attorney, *John A. Borell* and *Damian M.P. Rodgers,* Assistant Prosecuting Attorneys, for appellee.

SHERCK, Judge.

This is an appeal from a summary judgment issued by the Lucas County Court of Common Pleas in favor of a public agency caseworker in an intentional infliction of emotional distress case. Because we conclude that there is a question of fact as to whether the caseworker's acts were reckless, we reverse.

Appellee is Sammy Austin,[1] a caseworker for the Lucas County Children Services Board ("CSB"). In 1995, as part of his responsibilities ancillary to a child neglect and dependency action, appellee sought to determine paternity for then nine-year-old Tony H.

Tony H. is a dark-skinned African–American. Tony's mother, Indiola H., is a relatively light-skinned African–American. When appellee interviewed Indiola concerning Tony's father, she identified him as Louis (originally spelled Lewis) Irving. Whether Indiola initially informed appellee that Louis Irving was an African–American is in dispute.[2] According to appellee, once he obtained the name Louis Irving he turned the issue over to a clerical assistant whom appellee asserted bore responsibility for finding Tony H.'s alleged father.[3]

It is unclear how, but appellee or someone else at the agency identified "Louis Irving" as appellant, Louis Irving, a fifty-six year old white, self-employed bricklayer from Northwood, Ohio, whose nickname is "Red." On December 22, 1995, without apparent further investigation, appellee authored a case plan alleging that appellant was the father of Tony H. The plan called for appellant to "make his intentions known, establish paternity of Tony, * * * and pay support. Irving will be assessed for services." The case plan was filed with the Lucas County Juvenile Court and a copy sent to appellant.

According to appellant, the December 1995 case plan was only the beginning of many communications he received. Appellant testified that in a January 1996 telephone call appellee told him that they had been looking for him for "ten or eleven years" and that he had fathered an illegitimate "black child." Appellant quoted appellee as stating that it was the agency's intention, "to make him pay back from the time the mother conceived up until that point." More threatening letters followed from CSB over appellee's signature and from the Lucas County Child Support Enforcement Agency.

Appellant hired legal counsel and eventually obtained a face-to-face meeting with appellee. The meeting took place on June 11, 1996. According to the deposition testimony of appellant and his wife, as soon as appellee saw that appellant was white, he admitted that "we have the wrong Louis Irving."

1. The complaint that initiated the present matter also lists three John Does employed by CSB as defendants.

2. Appellee, in his deposition, denied ever having been told that Louis Irving was African–American. The statement was contradicted by a reported admission by appellee and in an affidavit by Indiola submitted while the motion for summary judgment herein was decisional.

3. The clerical assistant, in her deposition, described her position as that of a secretary without any investigatory authority.

Appellee apologized for the inconvenience and indicated that he, "would take everything out of the computers."

On July 3, 1996, appellant received another case plan from CSB indicating that his whereabouts were unknown. Appellant continued to receive notices concerning this matter for several months. In the fall 1996, appellant was informed that his name was in a Columbus computer as a deadbeat dad.

According to appellant's wife, appellant's initial reaction to the accusation that he had sired an illegitimate child was to think of it as a joke. However, once he concluded that the allegation was serious, he became seriously depressed, unable to eat or sleep. He lost weight, withdrew from friends, and his business suffered.

Appellant eventually sued, alleging that appellee and three other John Does at the CSB were guilty of intentional or reckless infliction of emotional distress and abuse of process. Following discovery, appellee moved for summary judgment, arguing alternatively that (1) he could not be sued as a individual, (2) his statements were entitled to judicial immunity, (3) appellant failed to present evidence that he intended to cause emotional distress or did so recklessly, (4) he is immune from liability because of prosecutorial immunity, and (5) he is entitled to sovereign immunity pursuant to R.C. Chapter 2744.

The trial court addressed only the statutory immunity in granting summary judgment to appellee. It concluded that the acts of which appellant complained were within the scope of appellee's authority, thus bringing him within the protection of political subdivision employee tort immunity. The court further found that these acts were not within any of the exceptions to that immunity enumerated in R.C. 2744.03(A)(6). From this judgment, appellant now brings this appeal, setting forth the following single assignment of error:

"The trial court committed substantial, prejudicial, and reversible error in granting appellee Austin's motion for summary judgement by finding that Austin's acts and omissions were not in a wanton or reckless manner."

On review, appellate courts employ the same standard for summary judgment as trial courts. *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198, 199–200. The motion may be granted only when it is demonstrated:

"(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." Civ.R. 56(C); *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 67, 8 O.O.3d 73, 75, 375 N.E.2d 46, 48.

■ "The burden of showing that no genuine issue exists as to any material fact falls upon the moving party in requesting a summary judgment." *Id.* at 66, 8 O.O.3d at 74, 375 N.E.2d at 47. See, also, *Johnson v. New London* (1988), 36 Ohio St.3d 60, 61, 521 N.E.2d 793, 794–795. A material fact is one which would affect the outcome of the suit under the applicable substantive law. *Needham v. Provident Bank* (1996), 110 Ohio App.3d 817, 826, 675 N.E.2d 514, 519–520, citing *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211–212.

This court has consistently held that motions for summary judgment should be granted with caution to protect the nonmovant's right to trial. *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 14–15, 13 OBR 8, 15–17, 467 N.E.2d 1378, 1386–1387. See, also, *Bowlds v. Smith* (1961), 114 Ohio App. 21, 18 O.O.2d 305, 180 N.E.2d 184.

R.C. Chapter 2744 sets up a scheme of tort immunities and defenses for Ohio's political subdivisions and their employees. R.C. 2744.03(A)(6) prescribes the statutory immunity available to an employee of a political subdivision sued for tortious conduct as an individual. The statute provides:

"the employee is immune from liability unless one of the following applies:

"(a) His acts or omissions were manifestly outside the scope of his employment or official responsibilities;

"(b) His acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

"(c) Liability is expressly imposed upon the employee by a section of the Revised Code." Former R.C. 2744.03(A)(6)

■ There were no allegations that appellee's conduct gave rise to any statutory liability or was outside the scope of his employment. Appellant's allegation is that appellee's acts were wanton or reckless. Whether behavior constitutes wanton misconduct is ordinarily a jury question, *Fabrey v. McDonald Police Dept.* (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35–36 *Matkovich v. Penn. Cent. Transp. Co.* (1982), 69 Ohio St.2d 210, 214, 23 O.O.3d 224, 226–227, 431 N.E.2d 652, 655; that is, a question of fact which, if material, would preclude summary judgment. See Civ.R. 56(C). The term "reckless" is often used interchangeably with "willful" and "wanton." *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 104, 559 N.E.2d 705, 708, fn. 1, . Consequently, in order to sustain a motion for summary judgment predicated upon immunity bestowed by R.C. 2744.03(A)(6)(b), a court must conclude that the record is devoid of evidence tending to show that the political subdivision employee acted wantonly or recklessly.

"Wanton misconduct" has been held to be a failure, "to exercise any care whatsoever * * * under circumstances in which there is a great probability that harm will result * * *." *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 4 O.O.3d 243, 363 N.E.2d 367, syllabus; *Fabrey,* at 356, 639 N.E.2d at 35–36. In the context of the substantive underlying claim of intentional infliction of emotional distress, the "recklessness" of the conduct necessary to establish the tort is characterized as behavior, "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Yeager v. Teamsters Local 20* (1983), 6 Ohio St.3d 369, 375, 6 OBR 421, 426, 453 N.E.2d 666, 671, quoting Restatement of the Law 2d, Torts (1965), at 73, Section 46, Comment d.

In this matter, appellee accused appellant of fathering a child of a woman not his wife and further abandoning the child without social or financial support. Were this a defamation action, allegations of such serious sexual misconduct and, in some circumstances, criminal conduct, would be defamatory without proof of special damage. Restatement of the Law 2d, Torts, (1977), 186–187, Section 571 and 574. The hurtful nature of such statements has been recognized in law since the Sixteenth Century. Keeton, Prosser and Keeton on Torts (5th Ed.1984), 792–793. Accordingly, we must conclude that, absent good cause for such allegations, their initiation may be of the outrageous nature contemplated by the restatement. It follows that one making such serious allegations has a duty to insure their accuracy.

It is undisputed that appellee initiated these charges. It is also undisputed that appellee made no effort whatsoever to verify that the Louis Irving alleged to be Tony H.'s father was the Louis "Red" Irving drawn into the system by these allegations. Appellee seeks to transfer the blame for this lack of verification on the clerical assistant who obtained appellant's address, but the clerical assistant described her duties as only that of a secretary. If her responsibility in this matter is greater, then that is a question of fact.

Moreover, there is a dispute over when appellee came to know that Tony H's father was African–American. The trial court refused to consider a late submitted affidavit from Tony H's mother in which she averred that she told appellee that Tony's father was African–American when she revealed the name "Louis Irving" to him. Instead, the court looked to appellee's deposition testimony in which he stated that the mother claimed ignorance of Louis Irving's address and refused to provide other identifying information on him.

Even excluding consideration of the tardy affidavit, there is evidence of record contesting appellee's assertion that he was not aware of Tony H.'s father's race. In both the diary kept by the Irvings, which was introduced as a defendant's exhibit during appellant's deposition, and in the deposition testimony of appellant's wife, appellee is quoted as making an admission that he, "knew that the father was black. We—he said this should have been stopped at the beginning." Therefore, a question of fact exists as to when appellee was aware of the true father's race.

Obviously, all of this only goes to exacerbate the outrageousness of the situation. The reckless conduct that may take this case out of the immunity statute, is that a public, employee should make official allegations of moral turpitude and potential criminal conduct against a citizen without any attempt to verify that the individual accused was the proper party. In this matter, a question of material fact exists as to whether this was the case and to what extent appellee was responsible.

Accordingly, appellant's sole assignment of error is found well taken.

In his brief, appellee urges us to consider his other four bases for the motion that the trial court did not reach in the event we find summary judgment was inappropriate on the basis relied upon by the trial court. Although the trial court indicated in its decision that these other arguments "may have merit," it did not address these points. We decline to now determine this case without first providing the trial court with an opportunity to rule on these issues.

On consideration whereof, the judgment of the Lucas County Court of Common Pleas is reversed. This matter is remanded to the court for further proceedings consistent with this decision. Costs to appellee.

*Judgment reversed.*

HANDWORK and GLASSER, JJ., concur.

GEORGE M. GLASSER, J., retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.