[Cite as *Roell v. Huddleston*, 2022-Ohio-11.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| NANCY ROELL, as Executrix of the Estate of Gary L. Roell, Sr., | : | APPEAL NO. C-210168 <br> TRIAL NO. A-1605115 |
| Plaintiff-Appellant, | : | |
| vs. | : | *O P I N I O N.* |
| JOSEPH HUDDLESTON, | : | |
| MATTHEW ALEXANDER, | : | |
| and | : | |
| WILLY DALID, | : | |
| Defendants-Appellees. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  January 5, 2022

*Friedman, Gilbert + Gerhardstein*, *M. Caroline Hyatt*, *Alphonse A. Gerhardstein* and *Jacqueline Greene*, for Plaintiff-Appellant,

*Montgomery Johnson LLP*, *Linda L. Woeber* and *Cooper D. Bowen*, and *Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Jerome A. Kunkel* and *Pamela Sears*, Assistant Prosecuting Attorneys, for Defendants-Appellees.

**ZAYAS, Presiding Judge.**

{¶1}   This case concerns the tragic death of Mr. Gary Roell during an incident on August 13, 2013.  Plaintiff-appellant brings this appeal to challenge the trial court's grant of summary judgment in favor of defendants-appellees.  For the following reasons, we affirm the judgment of the trial court.

**Factual Background**

*Depositional Testimony of Rachel Agarwal*

{¶2}   In the early morning hours on August 13, 2013, Rachel Agarwal awoke suddenly after hearing a loud noise.  Her first instinct was that maybe a painting or something fell, and the glass shattered.  She went to her living room and saw glass on the floor, and a flowerpot on the floor right by the window.  It was dark, but she saw a shadow there.  She told her dad to go turn the light on in the kitchen.  Then she heard the shadow say something.  She couldn't make out what he was saying, but she realized it was her neighbor Gary Roell.  She asked him, "What's up," and opened the door to go out to the patio.  She turned the patio light on and went out.  Mr. Roell was standing by the broken window.  She thought maybe someone had tried to break in and Mr. Roell had come to help.  She said, "Gary, what's up, what's up?"  Mr. Roell started saying, "water, water" and looked angry.  He was mumbling loudly and saying things that did not make sense.  She told him to tell her what happened and why he broke the window.  Mr. Roell started to pull the inside curtains out through the broken window.  To do that, he had to pull the screen out.  He "tossed" the screen in her direction.  The screen did not hit her.  She went back inside and had her son call 911.  Her son dialed the number while they all moved away from the windows, and then her son handed her the phone.  Mr. Roell was just pacing up and down by the windows outside.  He did not try to enter the house.

2

{¶3} Ms. Agarwal saw two police cars arriving. One stopped, and two officers came running. The first officer asked her if Mr. Roell was still there and, after she confirmed where Mr. Roell was, told her to go inside and lock the door. Both officers went behind the house. She went back inside and started looking out a window at the back of the house. The officers were trying to tell Mr. Roell to calm down. They were trying to capture him, control him. She first testified that Mr. Roell ran toward the officer with a hose in his hand, but later clarified that she cannot remember if he was running or walking. She said maybe it was somewhere in between the two—faster than a normal walk. The hose had a sprinkler attachment on the end. Mr. Roell was already holding the hose when the officers arrived. He was swinging the attachment part around in his hands towards the officers. The officers were entering the gate coming into the patio. Mr. Roell was closer to the house. They were moving towards each other. The officers told him to calm down. Mr. Roell was trying to say something, but she couldn't make out what he was saying. All she heard was "God save something" while he was on the floor and the officers were trying to "handcuff him or something." She also heard Mr. Roell say "help me" at least once. She could not see if the officers were able to subdue Mr. Roell or get him under control. She was too short to see much of what was happening. Her son was the one who told her when the officers had Mr. Roell under control.

{¶4} Ms. Agarwal testified that she could immediately tell something was wrong with Mr. Roell when she saw him because she had never seen him act like that before. She said, "He was definitely not in his elements." He was red in the face and had bulging eyes. She could tell he was angry. She had never seen that look on someone before. She lived next to Mr. Roell for four years and had never had a negative experience with him before this.

*Depositional Testimony of Soham Agarwal*

{¶5} On the morning of August 13, 2013, Soham Agarwal's grandparents came in and woke him up to tell him that something was happening and that a window was broken downstairs. He went downstairs. It was dark, but he heard his mom shouting, "What's going on? Who's out there?" He moved forward and saw the dining room was covered in broken glass and dirt. He noticed one of their flowerpots had been thrown inside and the window was broken, and that the curtain was being pulled outside. He could not see what was going on because it was dark, but he heard Mr. Roell shouting something about water. That's when his mother went outside. She came back in and locked the door when Mr. Roell started moving towards the door.

{¶6} They called the police and his mom talked to the person on the phone and told them what was going on. Then his mother told him the police would come in a couple of minutes and they went to the front door. A couple of police cars pulled up in front of the house, and the officers came up to them and asked where Mr. Roell was. He believed two officers came up initially. The officers did not ask them what happened. They told the officers Mr. Roell was in the back, and the officers told them to close and lock the door. The officers then ran behind the house. They closed the door and went back inside, and the officers were already around the house. He testified that the officers were saying something to Mr. Roell, "telling him to like calm down and to stop resisting and to come over there, something about drop something in his hand." It seemed like Mr. Roell had their hose in his hand. Mr. Roell initially was swinging the hose by the house, but he could not make out whether Mr. Roell was going towards the officers when he was swinging the hose. He said the officers were shouting at Mr. Roell and Mr. Roell "kept saying he didn't

4

have a weapon." And then there was some commotion and shouting, but it was hard for him to see because it was still dark. Then he heard clicking and buzzing sounds that sounded like a taser went off. At one point, it looked to him like someone was lying on the ground. He assumed this was Mr. Roell. He testified, "It seemed like everybody was standing around the person in the back." He could hear Mr. Roell "saying something like God, help me, repeatedly, or something like that." He heard one of the officers ask Mr. Roell if he was going to cooperate. He never heard Mr. Roell saying anything physically threatening to his mom or to the officers. He could not tell if Mr. Roell ever tried to hit anyone, but he was swinging the hose around while facing the officers.

*Depositional Testimony of Deputy Matthew Alexander*

{¶7} Matthew Alexander is a deputy sheriff patrol officer. He started in this position January 2, 2013. Prior to the incident on August 13, 2013, he received training on excited delirium. He did not know that Mr. Roell was having a "mental health crisis" when he encountered him, but he knew that it was a possibility. On the day in question, he heard a call from dispatch over the radio about neighbor trouble and someone breaking out windows. When he arrived at the scene, he noticed some landscaping had been torn up and "just disarray." He observed the complainant panicked and waiving them down on her front porch. He asked her where the neighbor was, and she directed him and Deputy Huddleston to the back of the residence. He did not remember if he asked the complainant any additional questions.

{¶8} He and Deputy Huddleston ran to the back patio area where Mr. Roell was. The patio is surrounded by a six-foot-high privacy fence, enclosed except for a gate. Mr. Roell, an older man, was standing by the broken window, screaming about

water, holding a hose and flowerpot. Deputy Huddleston loudly asked Mr. Roell what he was doing. Both he and Deputy Huddleston then asked Mr. Roell to show them his hands, using their "command presence." Mr. Roell was about 15 to 20 feet away from them. Deputy Alexander was standing directly outside the patio door. Deputy Alexander testified, "[Mr. Roell] then immediately, within seconds, charged at us." Mr. Roell was only wearing a shirt and was naked from the waist down. He asserted that Mr. Roell would not comply "whatsoever" when they gave orders. Deputy Alexander did not make any inferences at this point that Mr. Roell might be having a mental-health problem. He did draw an inference that something was "not right with him." He agreed during the deposition that the facts would be consistent with someone having a mental-health issue, but also stated that it could have been drugs or alcohol as well.

{¶9} He testified that Mr. Roell approached them at a "pretty brisk walk." Mr. Roell was still holding the hose and the basket. He did not see any other weapons on Mr. Roell. Mr. Roell kept yelling "no" and walked towards them in an aggressive manner. He remained outside the gate. Deputy Huddleston was either right next to him, or a step or two in front of or behind him. Deputy Dalid was not there at this point. Deputy Huddleston was "arcing" his taser as Mr. Roell was approaching them. He did not remember what Mr. Roell's reaction was to the arcing. He believed Mr. Roell "hesitated or stopped or kind of flinched." His goal was to get Mr. Roell under control. He consistently told Mr. Roell to show his hands in his "command voice." Mr. Roell never told them he was not armed.

{¶10} Mr. Roell continued to approach them and a struggle for control ensued. Deputy Dalid was on scene at this point. Mr. Roell was tased during the struggle but the taser never took effect. He agreed that Mr. Roell seemed to have a

6

lot of strength and was combative. Mr. Roell was also "slippery" when he touched him, but Deputy Alexander was not sure if this was from sweat or water. He admitted these were symptoms of excited delirium, that he was familiar on that day with what excited delirium was, and that he had been trained to know that excited delirium was a medical emergency.

{¶11} After being tased, Mr. Roell went back into the patio area. Deputy Alexander agreed that, when Mr. Roell went back inside the gate, Mr. Roell was not encountering any members of the public, but expressed that, because the window was broken, Mr. Roell could have tried to get inside the house. When asked if Mr. Roell was destroying any property at that time, he responded, "Not to my knowledge." He agreed that he did not observe any weapons, other than the hose, and admitted Mr. Roell never actually used the hose as a weapon. At this point, he had not called for emergency medical services ("EMS"). When asked if he agreed that the Hamilton County sheriff's training for excited delirium directs you to call EMS when someone is exhibiting signs of excited delirium "so they're available promptly after use of force," he responded, "If practical, yes." He testified that all the symptoms, however, are not exclusive to excited delirium, and could also mean the person was intoxicated or high. The tactical response is to get the person under control first and then determine what is wrong with him or her.

{¶12} When the officers entered the patio, there was "another struggle" for control. They attempted to handcuff Mr. Roell. Deputy Alexander testified, "[Mr. Roell] was still combative and flailing around and not complying." Mr. Roell was tased a second time during the struggle. They were ultimately able to get the handcuffs on Mr. Roell. Mr. Roell was also shackled after Deputy Alexander got the shackles out of his vehicle.

{¶13} Deputy Alexander did not recall if EMS was called before or after Mr. Roell was shackled. Once Mr. Roell was cuffed and shackled, the plan "was to get the squad there and check him out." He testified that while Mr. Roell was handcuffed, Mr. Roell "was constantly up and down, fighting, combative, and then he'd slow down; fighting, combative, then he'd slow down." He was telling Mr. Roell to "calm down," and had his hand on his shoulder/upper body area. When Mr. Roell was combative, he applied pressure and released the pressure when Mr. Roell slowed down. He stated, "So, I guess, during one of the times he slowed down, he – he lost his pulse." When asked if he knew that someone with excited delirium could lose vital signs after engaging in a struggle, he responded, "we agree that he can lose his vital signs." He testified, "We called EMS when we had the opportunity to. We were never given the opportunity to." He stated that they would still have to get Mr. Roell under control before EMS could do anything.

*Depositional Testimony of Deputy Joe Huddleston*

{¶14} Joe Huddleston is a deputy with the Hamilton County Sheriff's Department. He moved from corrections to road patrol on November 7, 2012. On the morning of August 13, 2013, he encountered Mr. Roell after hearing a radio call for neighbor trouble. When he arrived on the scene, the complainant came out to her door and was yelling. Deputy Alexander saw her first, and started to go around the back of the house. The complainant told him that Mr. Roell was in the back breaking things. He did not have any other conversations with her. He and Deputy Alexander opened the back gate and asked Mr. Roell what he was doing. He observed Mr. Roell standing there with a hose in one hand, a garden basket in the other, and facing the inside of the neighbor's house right at the window. Mr. Roell was roughly about 15 feet away from him and was only wearing a t-shirt and was nude from the waist

8

down. He testified, "He turned around and started coming toward myself and Deputy Alexander in an aggressive manner." Mr. Roell looked very agitated and angry.

{¶15} Mr. Roell still had the hose and the garden basket in his hands when he came towards them. He told Mr. Roell to drop what he had in his hands and get on the ground. Mr. Roell did not comply with his command and continued walking towards them in an aggressive manner. He did not observe any weapons on Mr. Roell, aside from the hanging basket. He believed Mr. Roell was acting bizarrely. He testified that he did not conclude that Mr. Roell was having a mental-health crisis at the time, but did suspect it after they had him detained. He stated, "I didn't really have time to formulate any kind of plan or suspicion."

{¶16} Mr. Roell kept approaching them. He said, "And then I got my Taser out, I pointed it at him and said, stop, get on the ground or you're going to get tased." Mr. Roell did not react in any way, he just kept approaching them. After Mr. Roell did not react to his command, he "arced" the taser, which was described as making a sound but not deploying anything. Mr. Roell flinched when he arced the taser but continued toward them. Mr. Roell was about five feet from them at this point. He arced the taser again, and Mr. Roell flinched again. He testified, "And then I decided to put it away." The entire time, he was giving commands to get on the ground while using his "command presence." He knew something wasn't right with Mr. Roell.

{¶17} After he put his taser away, Mr. Roell continued toward him. He testified, "I reached out and grabbed his arm." He tried to get Mr. Roell on the ground but he "slipped off." Mr. Roell was either wet or sweaty. This interfered with their ability to hold him, so Mr. Roell was able to slip out of their hands. He pulled out his taser and tased Mr. Roell. Mr. Roell flinched and then shut the gate. Mr.

Roell never said that he was not armed. At one point, Mr. Roell said something about wanting to get into the neighbor's house because it was dry and his was wet. He agreed that Mr. Roell was incoherent. However, he still did not determine that Mr. Roell was having a serious mental-health episode because he had also "dealt with drunks before." He did not recognize the signs as excited delirium. He did not recall being trained on excited delirium. He admitted that they talked about excited delirium in his taser training and agreed that excited delirium is a medical emergency. He also agreed that the training materials state to have EMS on scene before engaging the subject if the situation permits. However, he stated, "The situation didn't permit." He testified, "You're trained to get the subject under control."

{¶18} They got the gate back open, and Deputy Dalid was there at that point. They ran in and tried to get control of Mr. Roell's arms. Mr. Roell was kicking and thrashing around on the ground. He tried to assist by keeping Mr. Roell's legs under control. At one point, Mr. Roell was face-to-face with Deputy Alexander, so he pulled his taser out again and deployed it. They got Mr. Roell on the ground and handcuffed him. They had to use two sets of cuffs on the front to control his arms the best they could. Once they put the cuffs on Mr. Roell, they were trying to control his legs because he was kicking and flailing. He and Deputy Dalid told Deputy Huddleston to run to the car and get shackles to control his feet. While Deputy Alexander went to get the shackles, Mr. Roell started snoring and they were "able to breath." He got on the radio and called for EMS. Deputy Alexander returned and they put the shackles on Mr. Roell. Around 15 seconds later, Mr. Roell started flailing and fighting them again. He had his knee on one of Mr. Roell's legs and was trying to control the other leg with his arms. He did not identify the snoring as a

possible sign of cardiac issues. He first noticed that there was a problem with Mr. Roell when Deputy Dalid said Mr. Roell wasn't breathing. Corporal Steers did CPR until the squad arrived.

{¶19} When asked if he needed to put Mr. Roell in handcuffs, Deputy Huddleston answered affirmatively and expressed that Mr. Roell could have broken into the house and created a possible hostage situation with the family inside. He admitted that they alternatively could have placed an officer in the house or asked the neighbor to leave the house. When asked if he would want EMS on scene so they could step in right away if it was excited delirium, he responded, "If we knew at the time it was excited delirium, in a perfect world, that would be great, yes." He agreed that, based on what he knows now, the symptoms were consistent with excited delirium. He agreed that he had been trained, through taser training, to recognize the symptoms of excited delirium before the events that day. He also agreed that the protocol would be to have EMS on scene ready to assist if they knew they were going to a call for excited delirium. They did not call EMS until they had Mr. Roell handcuffed and shackled. He stated, "That's when time allowed, yes."

*Depositional Testimony of Deputy Willy J. Dalid*

{¶20} Willy J. Dalid works for the patrol division of the Hamilton County Sheriff's Department. He started in this position on June 5, 2012. As part of his training, he received training on excited delirium. When asked if he knew that excited delirium was a medical emergency, he responded, "I don't know that, but it's in the training curriculum." He agreed that the training also states that early coordination with EMS is key. He also agreed that the training on excited delirium would apply "whether the excited delirium is caused by a mental health crisis or by drugs."

{¶21} On the morning of August 13, 2013, he heard a call over the radio about a neighbor in trouble. When he arrived on the scene, he saw a patrol car in front of him and saw Deputy Huddleston run to the back on the right side of the complex. As he was getting out, he heard Deputy Huddleston loudly say "hey," and then he ran to the left side of the complex because he thought the person would be running. He did not observe the complainant. The first contact Deputy Dalid had with Mr. Roell was during the "control" outside the patio. He did not hear Mr. Roell screaming or talking gibberish. He did not hear Mr. Roell say anything during the "first contact." He did not observe Mr. Roell destroying any property. He did not talk to the other officers before engaging with Mr. Roell. He did not give any commands. He only heard Deputy Huddleston giving commands. He agreed that Mr. Roell did not have any weapons aside from the flower basket and a garden hose. He did not hear Mr. Roell say that he was not armed.

{¶22} He agreed that he could tell something was wrong with Mr. Roell. He stated, "Yes, there was something wrong with him, yes, either drugs or PCP." He denied knowing that Mr. Roell was having a "mental problem." He agreed that Mr. Roell was aggressive and had extreme strength. He denied recognizing this as excited delirium. He agreed that he was familiar with excited delirium at the time from his training.

{¶23} Deputy Dalid testified, "It was a struggle, [Mr. Roell] crawled, got up, went by the fence line, got tased, tried – when he closed the door, he said, get these fucking wires off me, and the door was closed." It was at this point that he observed that Mr. Roell was nude from the waist down. He did not call for EMS at this point because he "didn't have time." He testified, "Once he got [sic] tased, we pursued. That's what our training is, to gain control of him." He asked if his training stated to

have EMS available when force is used, he responded, "To have them available right at the time? When we had time, yes. We didn't have that time."

{¶24} After someone opened the gate, Deputy Dalid went in and tried to control the right side of Mr. Roell's body. He put one handcuff on Mr. Roell while they were on the ground. He saw another set of cuffs and put them together. He agreed Mr. Roell was alternating between calm behavior and extreme agitation. He only heard Mr. Roell say something about water once. At some point while Mr. Roell was struggling, Mr. Roell fell asleep and was snoring, so Deputy Dalid called for EMS. After the snoring, Mr. Roell started getting agitated again and tried to get up. Mr. Roell snored twice. He was the first one to notice Mr. Roell did not have a pulse, because he was by his shoulders.

*Depositional Testimony of Officer Jayson Alderman*

{¶25} Officer Alderman is a police officer with the city of Montgomery. On August 13, 2013, a call came over the radio for officer assistance. He was less than a minute away from the scene, so he responded to the assistance call. When he arrived at the scene, one of the deputies came out from behind the residence and met with him. They walked to the back patio where the struggle occurred. The officers were struggling to keep Mr. Roell on his side. He immediately noticed Mr. Roell was nude from the waist down. One deputy was trying to control Mr. Roell's feet and Mr. Roell kept kicking the deputy into the privacy fence. He went over to hold down Mr. Roell's right calf/ankle area. Four officers were attempting to control Mr. Roell at this point, and he was fighting the entire time. He noticed one of the deputies call for EMS during this time. Mr. Roell went silent. He turned Mr. Roell to the side and immediately noticed that his eyes were rolled back in his head, and he was blue around the mouth. They flipped Mr. Roell to his back and began CPR immediately.

13

{¶26} When asked how long it was after he got there that someone called for EMS, he responded, "It was very shortly – as soon as I – I got back there and I assisted and was helping control him.  It was within a minute, maybe two minutes.  It was very quickly."  Mr. Roell was still struggling when they called for EMS.

*Testimony of Deputy Matthew Sewall*

{¶27} Deputy Sewall was on patrol on August 13, 2013.  He heard a call come over the radio for neighbor trouble, but it was not for his beat.  A short time later, he heard one of the units on the scene ask for additional cars.  When he first arrived on the scene, he was looking around trying to find where the officers were.  He noticed an open condo door and debris or something on the ground.  As he was heading towards the condo, he heard screaming coming from the backside of the building, so he went to the backside of the building.  He identified the condo at the end to be from where the screaming had come.

{¶28} He entered the gate into the patio area.  He observed Mr. Roell on the ground with his arms underneath his chest.  Four officers were holding Mr. Roell on the ground.  Mr. Roell was "bucking" off the ground trying to get up.  An "unintelligible screaming noise, almost animalistic" was coming from Mr. Roell.  He did not touch Mr. Roell at this point.  Corporal Steers, now Sergeant Steers, arrived very shortly after.  Within seconds of when Sergeant Steers arrived, Mr. Roell "ceased fighting."  He testified that, after receiving a brief synopsis from the officers present regarding what occurred, Corporal Steers identified that it could potentially be excited delirium.  Mr. Roell was rolled over and they quickly identified that Mr. Roell could be in medical distress.  He and Corporal Steers went to check his pulse and identified no pulse.  Corporal Steers started CPR and he "held the airway clear."

14

*Depositional Testimony of Sergeant Mikal Steers*

**{¶29}** On August 13, 2013, Sergeant Mikal Steers, a corporal at the time, heard two separate calls for EMS coming from the incident with Mr. Roell. He testified that it is unusual to hear a call for a squad twice. A short time after, he pulled up to the scene. When he arrived on the scene, he was directed to where the officers were by someone standing in front of the residence. Mr. Roell was face down on the ground with his hands underneath him. Deputy Dalid was by his head with his hand on his shoulder. Another officer was at Mr. Roell's feet, but he could not remember who. Because he heard two calls for EMS, the first thing he asked was, "Who's hurt?" Deputy Huddleston responded that he had a small cut, Deputy Alexander had been punched and Mr. Roell had been tased. He told the officers to roll Mr. Roell over and bring him into recovery position. He testified, "When they did that, I noticed that he didn't look good; went and checked for a pulse and found none. And I began CPR." He continued compressions until EMS arrived.

**{¶30}** Sergeant Steers knew prior to that day that excited delirium was a medical emergency. He agreed that it is "preferred" that EMS be readily available but stated "it's not always practical or possible." He admitted that when he arrived, he said something to the effect of "this looks like excited delirium."

*Depositional Testimony of Corporal Jeffrey Gilliland*

**{¶31}** Corporal Jeffrey Gilliland responded to the incident involving Mr. Roell on August 13, 2013. He did not recall what the incident "came out as" over the radio. When he arrived, he noticed the flowers and shrubbery were torn up, mailboxes were knocked down, and a front door was wide open. He responded to the rear of the building after he heard yelling. When he got to the rear of the building, he saw Mr. Roell on the ground. Two deputies were on their knees next to him—one

was by Mr. Roell's feet, and one was by his head. He testified that there was a mention of somebody getting struck in the face. He could not remember if it was Deputy Huddleston or Deputy Alexander. He testified that Mr. Roell, "said something to the effect of, but you provoked me." That was the only conversation he heard. Mr. Roell was yelling and irate while he was on the ground. He noticed Mr. Roell was shackled. He asked the officers if he was cuffed, and they said yes. Mr. Roell was kicking and trying to push off the concrete with his hands to get up. The officers were preventing him from standing up.

{¶32} He asked the officers if they were okay, and they said yes. He then went inside the house to talk to the complainant. He noticed the window was broken. There was glass all over the inside of the condo, and there was a broken flowerpot. He testified, "and I turned around to check on the guys. And at that point, I saw Corporal Steers administering CPR to Mr. Roell, who was on the ground." When asked what happened next, he said, "I asked Mike if he needed my help. And he said no. They had already called for the squad. And the squad responded, and they took over CPR from Corporal Steers." When asked about how long it was before EMS arrived after he noticed Corporal Steers conducting CPR, he responded, "Couldn't have been a minute, maybe, at the most."

{¶33} The squad transported Mr. Roell to the hospital. Corporal Gilliland followed the squad. The emergency room doctors administered CPR and worked on Mr. Roell for "quite some time." Mr. Roell was ultimately pronounced dead.

*Report of Jennifer Schott, M.D.*

{¶34} The coroner, Jennifer Schott, M.D., determined that Mr. Roell's cause of death was excited delirium due to schizoaffective disorder.

16

## Procedural History

### *Federal Case*

{¶35} In August 2014, plaintiff-appellant brought an action against defendants-appellees, among others, in the United States District Court for the Southern District of Ohio. *See Roell v. Hamilton Cty. Bd. of Cty. Comm.*, S.D.Ohio No. 1:14-CV-637, 2016 WL 4363112 (Aug. 16, 2016). Relevant to our analysis here, state-law claims for wrongful death, assault, and battery were among the claims pursued in that case against defendants-appellees. *Id.* at *4. In its decision in August 2016, the district court declined to exercise supplemental jurisdiction over these claims. *Id.* at *14.

### *Present Case*

{¶36} On September 14, 2016, Nancy Roell, as executrix of the estate of Gary Roell, filed a complaint in the Hamilton County Court of Common Pleas against Joseph Huddleston, Matthew Alexander, and Willy Dalid. The complaint alleged causes of action for wrongful death, assault, and battery. Defendants filed an answer on October 14, 2016. The answer alleged that defendants were "entitled to all immunities and defenses available pursuant to Ohio Rev. Code § 2744.02 et seq."

{¶37} On January 16, 2018, defendants filed a motion for summary judgment, arguing, among other things, that defendants were entitled to immunity under R.C. 2744.03(A)(6)(b). Plaintiff filed her response in opposition to the motion on February 5, 2018, and defendants filed a reply on March 5, 2018.

{¶38} The trial court entered a decision granting defendants' motion for summary judgment on February 5, 2021. The trial court found that defendants were entitled to immunity under R.C. 2744.03 because no rational trier of fact could find that the defendants had acted recklessly. The court stated:

17

Under the facts described above, none of the officers who are defendants in this case was [sic] aware that he was facing a person with excited delirium. All of them were acting on the immediate priority of establishing control of Mr. Roell so that they could determine what the situation was while protecting themselves and others. While each of the officers acknowledged that he received training in general issues of dealing with mental health incidents and that excited delirium was among the topics covered in that training, the evidence in the record does not establish that any of the officers was thereby made an expert with a duty above that of the ordinary person to recognize excited delirium in the circumstances. Although it may be argued that the training received by the officers was sufficient to amount to negligence in failing to recognize excited delirium, it does not amount to recklessness. On the undisputed facts described above, no reasonable jury could determine that any of the defendants acted in a reckless manner. The individual defendants are entitled to immunity with respect to the claims here.

{¶39} Plaintiff timely filed a notice of appeal on March 5, 2021. Plaintiff-appellant now asserts a single assignment of error for our review, arguing that the trial court erred as a matter of law when it found that the defendants were entitled to immunity R.C. Chapter 2744.

### Law and Analysis

{¶40} We review a grant of summary judgment de novo. *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, ¶ 14. "A court may grant summary judgment only when no genuine issue of material fact remains to be

litigated, the moving party is entitled to judgment as a matter of law, and, viewing the evidence in the light most favorable to the nonmoving party, reasonable minds can reach a conclusion only in favor of the moving party." *Id.*

{¶41} "R.C. Chapter 2744 sets out circumstances under which political subdivisions and their employees are liable in tort in connection with governmental and proprietary functions." *Id.* at ¶ 6. "[A]n employee of a political subdivision is immune from liability *unless* the employee's acts or omissions were 'with malicious purpose, in bad faith, or in a wanton or reckless manner.' " (Emphasis sic.) *Id.* at ¶ 7, citing R.C. 2744.03(A)(6)(b). "This standard applies to law enforcement officers just as it applies to other employees of political subdivisions." *Id.*, citing *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994). When looking at statutory immunity for police officers, courts should " 'bear in mind that while many public employees face the potential for liability under R.C. 2744.03, no other public employee faces the potential danger, violence, or unique statutory responsibilities a law-enforcement officer faces." *See id.* at ¶ 15.

{¶42} Plaintiff-appellant argues that defendants-appellees are not entitled to immunity under R.C. Chapter 2744 because their actions amounted to reckless conduct. Thus, she does not contend that the officers acted with malicious purpose, in bad faith or in a wanton manner.

{¶43} "When a plaintiff files a civil action against an employee of a political subdivision, the employee's entitlement to statutory immunity is a separate and distinct question from the plaintiff's ability to establish the elements of his or her claim." *Argabrite*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, at ¶ 10. "[F]or example, if * * * officers had acted recklessly, they would not be entitled to

immunity, but they could still avoid liability by establishing that their reckless actions were not the proximate cause of [the] injuries." *Id.*

We are not reviewing whether there is factual support for each of the elements of the claims for relief. This appeal is limited in scope to a determination [of] whether there are genuine issues of fact material to the defense of statutory immunity. To overcome the presumption of statutory immunity, the facts must support a conclusion that the employee acted * * * in a * * * reckless manner. When the public employee moves for summary judgment on the issue of statutory immunity, the employee, as the movant, must show that there are no genuine issues of fact material to the determination [of] whether [the employee] acted * * * in a * * * reckless manner. Only if he meets that burden does the burden then shift to the non-moving party to establish that genuine issues of material fact do exist, requiring a jury determination whether the employee acted * * * in a * * * reckless manner. 'Consequently, in order to sustain a motion for summary judgment predicated upon immunity bestowed by R.C. 2744.03(A)(6)(b), a court must conclude that the record is devoid of evidence tending to show that the political subdivision employee acted * * * recklessly.'

*Corterel v. Reed*, 2016-Ohio-7411, 72 N.E.3d 1159, ¶ 15 (2d Dist.), quoting *Irving v. Austin*, 138 Ohio App.3d 552, 556, 741 N.E.2d 931 (6th Dist.2000).

{¶44} Because there is a fine line between reckless misconduct and ordinary negligence, "whether an actor's conduct was * * * reckless, * * * is generally a fact question for the jury to decide." (Citations omitted.) *Gilbert v. Cleveland*, 8th Dist.

Cuyahoga No. 99708, 2013-Ohio-5252, ¶ 15. "However, whether an employee of a political subdivision is entitled to immunity under R.C. 2744.03(A)(6) remains a question of law to be determined by the court." *Moore v. City of Cleveland*, 2017-Ohio-1156, 87 N.E.3d 858, ¶ 16 (8th Dist.). "Thus, we must determine whether, based on the evidence in the record, reasonable minds could conclude that any of the officers acted '* * *in a * * * reckless manner' so as to preclude immunity." *Id.*, citing *Argabrite* at ¶ 15.

{¶45} The Ohio Supreme Court has defined "reckless conduct" as "conduct 'characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.' " *Argabrite* at ¶ 8, citing *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 938 N.E.2d 266, paragraph four of the syllabus. Willful, wanton, and reckless, "describe different and distinct degrees of care and are not interchangeable." *Anderson* at paragraph one of the syllabus, citing *Thomas v. McNeill*, 53 Ohio St.3d 102, 559 N.E.2d 705 (1990). "These are rigorous standards that will in most circumstances be difficult to establish, especially with respect to a law-enforcement officer carrying out the statutory duty to arrest and detain a person violating the law." *Argabrite* at ¶ 8, citing R.C. 2935.03(A)(1).

{¶46} "In general, 'negligence is defined as "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation." ' " *Hoffman v. Gallia Cty. Sheriff's Office*, 2017-Ohio-9192, 103 N.E.3d 1, ¶ 48 (4th Dist.), quoting *Cleveland Metro. Bar Assn. v. Berk*, 132 Ohio St.3d 82, 2012-Ohio-2167, 969 N.E.2d 256, ¶ 12. "Negligence involves 'the absence of reasonable care.' " *Id.*, quoting *Berk*. " 'Negligence * * * does not involve intent or a conscious purpose to do a wrongful act or to omit the performance of a duty.' "

21

(Ellipses sic.) *Id.*, quoting *Tighe v. Diamond*, 149 Ohio St. 520, 80 N.E.2d 122 (1948). "Instead, negligence conduct 'conveys the idea of inadvertence as distinguished from premeditated or formed intention.' " *Id.*, quoting *Tighe*.

{¶47} " 'Recklessness * * * necessarily requires something more than mere negligence.' " (Ellipses sic.) *A.J.R. v. Lute*, 163 Ohio St.3d 172, 2020-Ohio-5168, 168 N.E.3d 1157, ¶ 17, quoting *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, paragraph three of the syllabus. Recklessness " 'requires a finding that the probability of harm occurring is great and that the harm will be substantial. A possibility or even probability is not enough as that requirement would place the act in the realm of negligence.' " *Hoffman* at ¶ 46, quoting *Preston v. Murty*, 32 Ohio St.3d 334, 336, 512 N.E.2d 1174 (1987). " '[T]he actor must be conscious that his conduct will in all probability result in injury.' " *Id.*, quoting *O'Toole* at ¶ 74; *accord A.J.R.* at ¶ 23; *Argabrite*, 149 Ohio St.3d 349, 2016-Ohio-8374, 75 N.E.3d 161, at ¶ 21, citing *O'Toole* at paragraph three of the syllabus. Thus, to find recklessness here, we must determine that the officers displayed a "conscious disregard or indifference to" the risk of harm to Mr. Roell that was unreasonable under the circumstances.

{¶48} It is undisputed that the officers arrived on the scene in the middle of the night in response to a call for neighbor trouble. The only information available to them upon arrival was that the neighbor had broken out a window. They did not know of any mental-health concerns before they arrived. However, signs of disarray were present in the area when officers arrived on the scene. When the officers engaged Mr. Roell, he was naked from the waist down, shouting about water and acting aggressively. Further, Mr. Roell had unexpected physical strength, and was wet.

22

{¶49} When Mr. Roell failed to comply with Deputy Huddleston's and Deputy Alexander's commands, a struggle ensued to gain control. Officer Dalid arrived during the struggle and assisted with gaining control of Mr. Roell. EMS was called once Mr. Roell was under control. According to the incident recall report, seven minutes elapsed between the time officers arrived on scene and when EMS was called. Two minutes elapsed between the time the officers had Mr. Roell in "custody" and when they called for EMS.

{¶50} The officers all testified that they did not recognize the symptoms as excited delirium, and instead testified that they felt it could have been drugs or alcohol. All the officers received training that addressed the signs of excited delirium and the importance of having EMS on standby when the subject is engaged in a physical altercation.

{¶51} Even assuming the officers had knowledge of facts which would allow a reasonable person to identify that Mr. Roell was experiencing an episode of excited delirium, there are no facts in the record which rise to the level of a consciousness or indifference on the part of the officers that their conduct would "in all likelihood" result in the death of Mr. Roell. No evidence was presented of any conscious choice by the officers not to call for EMS once they recognized the need for emergency medical assistance. The officers arrived in response to a crime call. Their training dictated that they get the subject under control. They did not recognize this as a case of excited delirium. The testimony was that EMS was called as soon as the situation permitted. The evidence at most shows that the officers failed to recognize this as a case of excited delirium and failed to recognize that they should have called for EMS before engaging Mr. Roell in a struggle. This evidence does not rise beyond negligence as it at most establishes that the officers failed to exercise the standard of

care that a reasonably prudent person would have exercised in a similar situation. Therefore, we agree with the trial court and hold that reasonable minds could not conclude that any of the officers' actions amounted to recklessness. Accordingly, defendants-appellees are entitled to immunity under R.C. 2744.03(A)(6)(b).

## Conclusion

{¶52} Having overruled the sole assignment of error, we affirm the judgment of the trial court.

Judgment affirmed.

**MYERS** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry this date.